Well, good morning one and all. I hope everyone's well. And our first case, we've been calling it Bakran. Is that how you pronounce it? Yes. Right. So, come forth and be heard. May it please the Court, Nicholas Massidi for Appellant Ahmed Bakran. Good morning. Good morning, Your Honor. Would you like to reserve any time? Oh, yes. Thank you for reminding me. I'd like to reserve five minutes, if possible. Five minutes, so shall it be. Go ahead. Thank you. So, the first issue in this case that we're arguing is that the Adam Walsh Act, which bars my client, the U.S. citizen petitioner, from petitioning for his foreign spouse, violates his substantive due process rights under the Constitution, you know, under his right to marry. Right. So, here's the question that we have for you. Sure. We're trying to figure out how do you get past 1252? In terms of, well, once you assume that it's a discretionary decision, it's within the ambit of the agency's discretion, right, it's a focus on the decision and not the process. You look at 1154, which says it's unreviewable. How do we get past that? So, as the lower court found and other courts have found, we broke the statute into two parts. One is that it says, essentially, he shall not petition for his spouse. The second part is unless he shows, at the sole and reviewable discretion of USCIS, that he's no risk to his spouse. So, breaking it into two parts, the word shall doesn't confer any discretion. It's not may, maybe, perhaps. It's not discretionary. All the courts in the context of I-130 petitions have found that. What's discretionary is the no risks assessment. So, our constitutional claim is not that the no risk assessment is violating his constitutional right. It's that the bar to him petitioning his spouse is violating his substantive due process right. Okay, if I could, there seem to be two buckets of claims in your case. One is a constitutional claim you've just described, and one is, at least in your briefing, and maybe you're giving that up, is you want us to conclude that the use of the burden of proof that was set and the rareness determination violates basically the APA. It's ultra-virus. And I think Judge Greenway might be asking is, at least as it relates to those latter claims, how do we get past it? If I understand your argument on the constitutional claims, your argument on the constitutional claims is, you are, I'm correct, you're attacking the statute, not the decision. Am I accurate about that? Right. But with respect to the APA bucket, are you still asking us to exercise jurisdiction over that, or are you conceding like the Eighth and the Fourth Circuit have already held, we lack jurisdiction? Right, no, we're not conceding that. That argument is slightly different because we're arguing under McNary versus Haitian Refugee Center that that falls under the policies and procedures, that we're not challenging the standard of review falls under that. So if I could simplify it for you, I think there's two decisions that you've probably looked at but that I would reference that show both sides of this. One is the Bremer case, which says that the standard of review is basically part of the discretion that's afforded to USCIS. The second one is Burbank, which is a district court case, but it disagrees with that in terms of it finds that it's not part of the discussion, it's part of the policies and procedures under McNary. So I guess the issue for you is which side you come down on. Isn't the challenge, though, in applying McNary is in McNary there was a constitutional challenge to the policies and practices and procedures, and here you're challenging those decisions as ultra-virus. Does that distinguish McNary in any meaningful way? I don't think so. If anything, I think it makes it stronger. There's a case Leiden v. Kine. It's from the 50s, which basically it was a completely different context, and the courts have sort of come away from it a little bit. But I think the premise still holds true that if you're challenging the unlawfulness of a decision, basically the court has more of an argument for jurisdiction under the ultra-virus. If you're arguing that this is not a challenge to the decision, but it is a challenge to the administrative process, give me an example of a challenge to the decision-making of the agency. Well, I would say that, for example, saying they didn't consider the psychological report in a meaningful way or something along those lines. McNary, I think, made clear that I don't get the connection there, because what's the distinction between that, essentially claiming that there's something that the agency didn't consider and complaining about the decision itself? Because what McNary distinguished was individual determinations versus broad collateral tax to policies and procedures. And it was in the context of a class action. So we're not saying specifically Bachman's case deserves to be approved. We're just saying that every case under the Adam Walsh Act, that the heightened standard is unlawful. Does that make sense? Well, I understand why you don't want the beyond reasonable doubt. I totally get that. But the question is, how do we get there? Particularly if it appears as though your challenge is not the more broad challenge where there could be an argument that we could exercise jurisdiction. It seems to be totally focused on the decision. Your use of McNary is a little confusing to me, because I think McNary is distinguishable on a couple of grounds, and I don't see how that's helpful to you. Well, I don't know if we have time, but do you want to let me know? We have time to do whatever you can do. I don't see how McNary is not helpful to this case. Let's decide McNary for a moment. Okay. Answer the first question, which is, how is this not a challenge on the decision of the agency? And how is it, in fact, from your perspective, a more broad challenge on the administrative process? Because we're not challenging the specific facts of the case and whether they come out beyond a reasonable doubt or not. We're not saying he submitted a psych report and he submitted an affidavit and things like that and all the evidence is in his favor, so fine in his favor. We're saying that every person that files one of these cases that falls under the Adam Walsh Act has to go through this barred standard. And I believe my reading of McNary was that that was – I can't stay away from it, sorry. My whole premise is based on that. So it's a broader challenge. We're not challenging the specifics of what USCIS looked at and what they said about it and what the decision is. This applies to any case under the Adam Walsh Act. It doesn't just apply to his specific case. Maybe someone else didn't submit a psych report or some other piece of evidence. But that's not what we're – essentially, the facts of this case don't really matter. It's what they're applying to, the facts.  Well, Mr. Mazzitti, are you saying that by erecting a beyond a reasonable doubt standard that the service has violated its statutory mandate by actually providing for a roadblock that means that nobody will be approved? If facts don't matter, isn't that your argument? Basically, yes. With the barred standard, the presumption of denial, the fact that you have – even if an officer views this case and says, I believe this is approvable, they have to go to not only one supervisor, then a supervisor above that supervisor and convince both of them to sign off. Essentially, it's not – they've essentially blocked the exception that Congress created. If the petitioner is called upon to prove a negative beyond a reasonable doubt. Right. Is there any support that you could find in other agency actions? I mean, you've pointed out that in the civil context, beyond a reasonable doubt is almost never used. Have you found any cases that actually support this position that an agency violates its powers when it erects a barrier so high that nobody can prevail, even though Congress meant for there to be a scheme where at least some people prevail? I haven't found that, but I would just argue that what the government's argument is is that the word no in terms of you have to show no risk connotates beyond a reasonable doubt no. But this is the first time that this has been used in the immigration context, as well as other parts of the INA where it says the term no. They don't require that to be showing beyond a reasonable doubt. But to your specific question, do I have a case where – I believe this is your question – where they've created a barrier so high it's insurmountable. I haven't found that case, no. Beyond a reasonable doubt, does that look different from – beyond a reasonable doubt, no. Does that somehow look different from clear and convincing evidence, no? That's a good question. I haven't thought about that exactly, so I don't know the answer. But again, I don't think that any heightened standard is appropriate here. I believe the preponderance of – our claim is that preponderance of the evidence is the appropriate standard. Again, going back somewhat to your last argument, in the context of marriage cases and showing a marriage is a bona fide marriage, Congress specifically spoke and they said you have to show the heightened standard, which I believe is a clear and convincing standard. Here, Congress clearly was silent. So Congress knows to use the heightened standard. They've used it in the specifics of the INA and other sections, and they didn't use it here, which to me, again, connotes that they didn't intend this to be used. And the – You began your argument by saying that there's a substantive right, constitutional right, to marriage that includes the right to live with an alien spouse. And I don't want to put words in your mouth, but do you want to briefly return to that? Because that seems to be the linchpin of your argument. Yes. Essentially, the government's arguing that because he has a marriage certificate, the right to marry is satisfied with that. We're arguing that he has no benefit to his marriage if he can't actually petition for his spouse. They can't live together. Because of his crime, he can't go to her country. She can't stay here unless she stays here illegally. So, I mean, obviously. Does this process foreclose her from seeking citizenship of her own accord? Through employment or some other means? I'm sure if we sat here, we can come up with probably five ways in which she could find her way to citizenship. And find her way to an ability to live in the United States legally. Does the AWA bar that? No. Is it so easy that she can just find that? No, it's not. The question is not whether it's easy to become a citizen. The question is whether she is precluded from following up on her own. No, she's not. Which, to me, is against the government's argument that this is protecting her. It's either keeping her with a U.S. citizen here illegally in sort of this quasi-status where she's dependent on him and has to hide from the government. Or she has to find another means and then she can live with him and there's no protection if this person is such a risk to her. So you have a problem with the logic of it? Yes, I just think that that argument runs the face of what the supposed purpose of this is, which is to protect her. Really the purpose of the AWA is supposedly to protect children. Here they have two children who are U.S. citizens, so if she were deported the two children would be left with a U.S. citizen father, who is a sex offender, which goes against the supposed reason of the law. That's what they claim the reason of the law is to protect children. And then through litigation the government's now claimed that it's to protect the foreign spouse as well. Well, the commentary by Congress suggests that to protect the public at large is really what children and the public at large. Staying on this question, though, on the marriage issue, this benefit, because it's an immigration benefit to be able to, you could say, jump the line or be exempted from the numeric limitations to be able to apply for your immediate relative. And that includes parents, children, siblings, spouse. So this is an immigration benefit that is not contingent on marriage. So it's not the kind of benefit that was discussed by the Supreme Court, because the benefits that the Supreme Court talked about in Obergefell dealt with things that you uniquely get because you're married.  What do you say to that? And I have a second question on this subject. How did this fall into those benefits that you're saying as a married person he's entitled to? Well, because in Brock v. Rutherford, the court found that it's a violation of the rights to marry when it significantly but not prohibitively interferes with the exercise of familial rights. So even if you assume that she can get her status through another means, which I think is quite an assumption because — My question doesn't even assume that. My question is a little different. My question goes to the constellation of benefits spoken about and the benefits that were talked about in that case and the kind of benefit you're contending your client is entitled to, because the focus is your client. You mean the benefits when you're saying — Benefits of — When you're saying Obergefell, you're meaning the benefits of marriage. And the kinds of things that the court talked about were all things uniquely triggered by the marital relationship, like inheritance rights, being able to be with someone when they're sick, the spousal privilege, et cetera. And isn't this a little different? Because this benefit doesn't just go because one is married. Others can actualize this benefit, i.e. parents, children, et cetera. So isn't this different? Well, is it different than Obergefell? Yes. But our position still is that it significantly interferes with his right to build a family, his right to marry. Which brings me right to my second point. I'll assume for the purposes of this question that there's some sort of right to reside with your farm board spouse, assume that, although no court has adopted that view. And you're shaking your head yes because you agree with no court has adopted that, correct? What I'm trying to do is assume it. Okay, so assume that. But isn't this no different than any other time a convicted felon loses a fundamental right? The right to serve on a jury, carry a firearm, vote, et cetera. There's a whole host of rights people lose that are lost by convicted felons. Why should this be treated differently from — Why should this be treated differently? Well, wouldn't those be subject to strict scrutiny in that analysis? So it's your view that if we were to take that view, we'd have to do a scrutiny analysis? Yes, that's my view, yes. That those rights or whatever you want to call them that are lost may meet that scrutiny and be narrowly tailored, et cetera. But I don't believe that this explicitly being narrowly tailored meets that. That's our argument. But his interference with his marriage right is not anything other than his status as a convicted felon, correct? That's the only thing that is impeding him from being able to sponsor this petition, right? So it's not some immutable characteristic or protected characteristic that interferes, correct? It's not an equal protection claim. It's substantive. We're not saying he's a protected class because of his conviction. I understand. Thank you. So that means that you're arguing that the right to cohabit should rise to the level of the other — well, some of the rights that Judge Schwartz just mentioned are obviously constitutional, the right to vote, for instance. So you're saying that the interference here is really the right to cohabitate and that that right should now be elevated to a constitutional right? Because if it's merely the right to marriage, the government says, well, they're married, so what's the issue? Well, that's focusing on defining marriage in the narrowest terms. I think if you look at the case law, the right to marriage is based on the right to privacy, and included in that is the right to build a family and certain familial rights, which in my understanding all are fundamental rights. My only question is, are you arguing that the right to cohabitate somehow should be elevated? Because if it's merely the right to marriage, the government's argument, as I understand it, is, well, they're married, so there is no impediment to that. So then your argument has to be something slightly more. It's got to be that it's impeding the right to cohabitate. And in order for us to give you the relief you seek, I would presume that you'd have to essentially elevate the right to cohabitate to be cognizable as a constitutional claim. I don't think our claim is just on the right to cohabitate. It's the right to build a family, to marry a spouse of your choosing, to live together as husband and wife. Granted, I haven't found a case that specifically deals with marriage in this context, so I haven't found one that really defines what marriage actually means. But our contention just is that the government's argument that it's just the right to get a marriage certificate is not what the right to marry entails. All right. Thanks so much. Thank you. Good morning, Your Honors, and may it please the Court. I'm Sarah Wilson on behalf of the Secretary Kelly and the defendant at police in the case. The district court correctly granted summary judgment in favor of the government in this case, but before the Court reaches the merits of the district court's decision, I think it first has to examine whether there is subject matter jurisdiction to entertain the APA claims that are raised in this case. So let me ask you the same question I asked your adversary, and that is, is there any way that we can move past 1252 to even get to the APA and constitutional claims? Is that initial impediment such that we go no further? We go no further with respect to the APA claims. We're not contending that the constitutional claims here are barred. Now, there's a difference in the constitutional claims that were raised in the two decisions that we've cited to this Court before, the May circuit, that also found that there was a bar that applied to the constitutional claims there. Those constitutional claims were slightly different than the ones being raised in this case. In that case, it was a challenge to the constitutionality of the agency's enterprise of that discretion. We don't understand that to be the claim that's being made in this particular case. This appears to be a claim to the constitutionality of the statute. So the answer to you is partially yes. You can't go any further than 1252A2B2 when deciding the APA case, and we've cited the two cases. The only two circuits that have addressed this point, the Fourth and Main Circuit, have agreed with that analysis. If you look to the Fourth Circuit's decision, the Rowland decision that we cited in the 20HA letter earlier this week, it says that you couldn't, can't, quote, divorce the standard and the burden of proof and the presumptions that are applied from the actual no-risk analysis. Therefore, that has to be considered all part and parcel of that analysis that Congress made very, very clear that they intended to shield from any sort of review. So you're not suggesting, then, that if we were to agree with that approach, that the assignment of a burden of proof and even directives to the field to exercise that discretion or recommend the discretion to be exercised narrowly, you're not saying that that means every action by the Secretary is barred from review, i.e., if the statute, if the Secretary's action is clearly ultra-virus, that is, beyond what Congress allowed, are we barred by 1252 from reviewing that? That's a really good question. I think that it comes down to the very same analysis because you still have to look at the statute and you have to look at the authority granted by the statute. Here, the authority granted to the Secretary is completely covered by the sole reviewable discretion language. So I think that there are predicate legal questions, as the Eighth Circuit recognized, that may be outside of the scope of the grant of authority that Congress gave and intended to shield from any sort of review, but that wouldn't necessarily be, that's not any of the claims that are being raised here. What if your memo said not it should be rarely granted, but says it should never be granted? Like, we know it's, you know, we have the discretion, but field, we are not granting it, don't recommend it. Would your argument be that might be ultra-virus because Congress assumed an exception could exist if the no-risk determination had been satisfied? I think you're getting at a point that's correct, that there could be some actions by the Secretary that would be so far outside of what Congress intended to allow them to do that would not be shielded from review. I think that's something the government would accept. I think it would be a pretty rare situation. Maybe if it was every single person covered by any convicted act would never get any sort of review at that point. There would be a question of whether there's really a good faith engagement of that review process. Congress asked the Secretary to engage in. Thinking short of that, I think it's pretty clear that the AWA and through 1252A2B2 and even the APA itself intended to shield from review. So I don't think we get any further than that. Ms. Wilson, haven't they erected, though, a barrier to review by the two memos by setting the standard as it is? Isn't it impossible to prove beyond a reasonable doubt that there is no risk? This building suffered the risk of bricks falling out onto the sidewalk, and that was happening, and there was tens of millions of dollars spent to shore up all of the bricks. Even today, though, could I prove beyond a reasonable doubt that there's no risk that any brick will fall off of this courthouse again? I think you have to go back first to the complaint here in this case. The challenge to the standard was not made as an ultra-various claim. It was made as an arbitrary and capricious misclaim. So I think that that still falls within what the APA would say is barred in terms of review. What was an ultra-various claim when you look at the complaint in this case was the presumption standard. And I think you would look at and see whether or not the Secretary had discretion to issue a presumption. And here I think it's still covered within the general instruction to the Secretary that they could say, you know, our belief in our reading of the statute is that Congress intended these grants to be fairly rare, and we think that that's a fair reading of our authority to look at each of these applications and make a really serious, hard look at whether or not this person shows that there's reason to exempt them from that. But look at what you're dealing with here. Previously convicted sex offenders who've abused children and meet the definition of the act, albeit 10 or 15 years ago in this individual's case, how could he ever prove that he's at no risk to his spouse or child? We know that spousal abuse is a risk in lots of marriages. How could most people, even not previously committed offenders, prove that beyond a reasonable doubt that there is no risk from one spouse to the other? Well, I think my first response would be that that's an argument with regard to the statute and not with regard to how the Secretary's exercised that discretion. The no-risk analysis, the no-risk directive comes from Congress itself. No, I think it deals with the degree of certainty that has to exist in the no-risk assessment, doesn't it? Like any finding that the agency makes, it's a finding of a fact, not an immutable truth. And so why wouldn't a preponderance of the evidence standard serve the purpose that Congress intended, while a beyond a reasonable doubt standard frustrates that purpose because it, I believe, unless you could come up with an example, precludes anybody from receiving this benefit? Well, I'll answer that last question first. That's not an allegation in this case, and indeed in other cases it's been argued in, presented to courts, that we have approved individuals that are falling within the scope of this. This is not an absolute bar, and that's not the contention, I don't think, here. So that's not a concern for the court. And then I'll also say that the beyond a reasonable, I do think that the no-risk analysis itself in the statute sets a standard separate and apart from what the Secretary's done. So I don't think you can ignore the fact that the statute says no risk. And I think that that no-risk language answers the fact that a preponderance of the evidence standard would simply not be in keeping with the statute. We've argued that if you get past the bar, you would then analyze whether or not we have a reasonable interpretation of the statute. And I think that we do here, because if you're looking at an analysis that says, I want to know whether by a preponderance of the evidence somebody poses no risk to somebody's spouse, that essentially asks the question, is there a 49% chance that this person's not going to commit a crime or not going to be dangerous? I saw that in your brief, but I don't think that that's what follows. If you have a preponderance of the evidence standard that there's no risk, then you're saying, I am more convinced than not that there is no risk. That's different from saying there's a 49% likelihood still that there's considerable risk or substantial risk. It is in some cases. I mean, in some cases you might think that that 50% chance is enough to convince you. In other cases where it really is, it comes down to a decision that 51% of me thinks that this is probably not a risk, but there's still a 49% chance that this person poses a danger. I think that's still within the secretary's umbrella to decide that that's a standard and that's a risk. That's a percentage that the secretary simply wasn't comfortable with. I guess I don't see the 49% the same way. It's 49% that I'm not certain. That's all that it is. Am I quite sure? Yeah, I'm 100% quite sure. Am I certain that there is no risk? Yeah, I'd say 50% certain. I think we'd go back. We'd still have to start with the analysis of whether 1252 lets you get there. Because this is an arbitrary and capriciousness claim with regard to the setting of the standard, the question is was it unreasonable for the secretary to conclude that that's the way that they, the secretary viewed that standard and viewed the way that that standard would be adjudicated by his field officers. So I think the memo still survives. It still survives both 1252's directive and survives the. . . I'm sorry. Is there no ultraviolence claim in this case? There is, but it's not with regard to the standard. It's with regard to the presumption. So the burden of proof standard in the complaint is raised as an arbitrary and capriciousness claim. The claim to whether there's a presumption or there's a direction to the field that you should presume denials, that was raised as an ultraviarious claim. And we would say that that is not ultraviarious because it's not a bar. It just says that we're going to start from the presumption that if you have this claim or you have this type of conviction, that means that we think that Congress correctly decided that you may pose a risk, that you essentially trigger this analysis. So I think that the ultraviarious claim just doesn't get. . . that ultraviarious claim just doesn't get there on the merits. Let me ask you a question about your adversary's marriage claim, and it seems to encompass or envelop the right to cohabitation. So if you look at the Supreme Court's East Cleveland case, it appears that that focuses on immediate family members having a fundamental right or at least a right to cohabitation. Does the AWA inhibit that right? Well, first I think we have to go back to what the claim in this case is. Here the claim in this case is that it's a fundamental right. So it's not even that there's some sort of protection or liberty interest to which procedural due process would attach. The question for this case is whether it's so fundamental that no burdens and no impediments could be applied to this right. And I don't think that the East Cleveland case gets there. I think that that suggests that there can simply be nothing to stop cohabitation, and indeed that's simply not the case if you look at service members are often required to be separated from their spouses. That was acknowledged by the Dinn dissent. But there certainly are instances where the government is completely comfortable with abridging that right to cohabitation, suggesting that that's not a fundamental right as being alleged here. If you look at the district court's footnote one, you can see that the district court was cognizant of the fact that this isn't a procedural due process case, that you don't have to go and do the secondary analysis of weighting or comparing the choices that Congress made in this case because that's not what's being alleged. That's not the claim that's being pursued. And if you start the analysis from the proper point, that would be Reno versus Flores. It says that you have to look at the right and describe it with particularity. And I think this panel has been very careful with the way that it's been describing. This isn't about a right to marriage. This is about a right to reside with a spouse, a foreign-born spouse in the United States under a particular visa program. It's not even as if this is a bar to his spouse residing in the United States. If she can find a visa program that doesn't leave her completely dependent on somebody that we think might pose a danger to her. So I think even if you were to apply something that was more rigorous of analysis than perhaps even he's arguing for here, the statute would likely survive. So you're saying that our analysis should be in the first instance look at the right for claim to exist, that is the right to reside with a foreign, as you just said, foreign-born spouse who wants access through this particular visa program. You would like us to conclude there is no such right. That's right. What authority should we look to to reach that conclusion? Well, so I think the DEN decision gives you a very good starting point. The DEN decision shows that there's at least five votes for showing that this is not a, actually I'll back up. I think that the DEN decision indicates that all the justices were in agreement that this wasn't a fundamental right. But if there is such a right that exists that is narrowly defined in the correct manner, if you define it properly, that right is simply one that is a liberty interest to which you have some procedural due process entitlements. And that's not saying that we have a fundamental right that cannot be abridged by the federal government. So I think that the DEN decision, and looking specifically at how the DEN court addressed it, versus how, for example, the court addressed the right that was at issue in Windsor, indicates that there is quite a difference in the way that we want to treat this particular right when properly and narrowly defined, which is a right, a more broad right to marriage, or perhaps a more fundamental right to marriage. I think that that, the DEN decision, especially when read in light of what the Supreme Court did in all those marriage cases, demonstrates that the court used this right differently, abused the status that it wants to accord this protection differently. So your view is that if we did rule in the manner in which your adversary suggests, that would be extending the fundamental right that was cognizable in Obergefell? That's right. I think it would be a big extension of what the court was doing and really shows what the court was avoiding doing in DEN. I don't think that there's any court that sets this, any decision that I'm aware of that sets the stage that this would be so broad of a right. In fact, we've cited a number of cases, circuit court cases, on page 20 of the government's brief that shows that, you know, at least when you're talking about the petition for review context, where somebody is, you know, challenging their right to remain in the United States, courts repeatedly said that there's simply no, there's no right, there's no fundamental right for you to remain in the United States just because your husband or wife is a citizen and also lives here. That that's not the way that this right works. All that is due is due process, and the removal process in those cases, the petitions for review was found to be sufficient. Here the district court likewise found that the procedures in place were sufficient. Here there was a notice, an opportunity to respond, to show that there was no, that your crime was properly categorized as being one captured by the statute. There's an opportunity to submit additional evidence. Ultimately, if there's a removal proceeding, if we want to try and remove Mr. Bachman's spouse, she would have the full rights to a 240 hearing, so she would have all the opportunities to make those arguments in immigration court proceedings. What if any consideration should we give to the fact that this statute only deprives convicted felons of this immigration benefit? Should that influence our decision on this marriage right argument? I mean, I think it does. I think it shows that the trigger is not one that would require strict scrutiny by the court, that there's not, you know, you would look more, instead of looking at the equal protection line of cases, you would look more at Fialo versus Dow or the Mandel decision, both cited by the DEN courts, that talk about how you don't, you would want to give sort of a thumb up scale in favor of the governmental decisions there, because under no area or subject matter is the government's ability to legislate more plenary. Therefore, it's not going to be a strict scrutiny analysis if we're going to look at it that way. I think that those cases certainly demonstrate that. Whatever the claim is, it's certainly not a claim, or there's certainly no case law to support the idea that this is a more fundamental right than, say, the right to vote. Thank you. Okay, thanks so much. Thank you. Before I get into arguments, I just wanted to clarify one thing. I don't see where the government's getting the argument that we didn't make the standard of review ultra-virus claim. I don't know if you have the appendix in front of you. Are you looking at the complaint? Yes. Can you tell us where you're looking? Yeah. Page 60, Clause 7, it says, APA violation ultra-virus regulation. It then says on the next page of Paragraph 111, that beyond any reasonable doubt, standard violates the plain language of the statute and is inconsistent with the law. And then on the next page, Page 62, the end of Paragraph 118, I believe this is referring to the barred standard, but it says, In doing so, USCIS has required more than the statute permits in this policy memorandum, elevating the burden of proof as ultra-virus. So I think that was clear to me. The other thing I wanted to point out with Din and these supposed other cases that you should look at that are against us is in Fiala, first of all, as well, these cases were made in the context of the foreign spouse applying for some benefit. The case that you gave us, I think is more applicable to this case. We're arguing that the government in this context, which I believe they've never done to a U.S. citizen, is taking away rights, benefits from the U.S. citizen, not from the foreign spouse. So to put it another way, I would have a lot more trouble bringing this claim with the INA said that a foreign spouse is barred from coming to the U.S. if they're married to a U.S. citizen. What we're contesting here is that they're taking the ability of the U.S. citizen away to petition foreign spouse, and to my knowledge, this has never occurred before. So there's a distinction there that we're not challenging something that, basically, we don't feel that plenary power applies or is as applicable here, because the foreign spouse really is not the issue. The issue is that they're taking this ability away from the U.S. citizen. I wanted to go back to the APA issue. The question goes to, again, our authority need to get to whether the setting of the burden of proof or the rareness requirement is something we can review. The statute uses the words determines, and the Eighth Circuit, I think, made a fuss over the word determination or something like that from distinguishing McNary. The word determines, go back to the dictionary, and it could mean the end decision, or it could mean sort of the manner in which or how to find out what the decision should be. If we look at the meaning of determines, doesn't that include the things that the process used to reach the decision? And if that's the case, isn't that within the agency's discretion, and therefore we lack the authority to look at those two issues, the standard of proof and the rareness directive? Well, I think that McNary made that point that it's the process that can be reviewed, not the final decision. Again, that was my reading of McNary, and I think that you made a good point when you said, when you asked if they could make the standard of review that it's never approved. So where does the standard of review stop? And if she's saying that you can hear a case where it says never, but you can't hear a case that's beyond a reasonable doubt, I don't see the distinction there except that they're different standards of review. So on the one hand, if the standard of review is never, apparently for some reason you could review it, and if it's beyond a reasonable doubt you can't review it, I thought that that was a good point as well. That's all I have. Are you familiar with our Yi case? Yi? I think that's how you pronounce it, Y-I. I believe I have it in my file back that I reviewed. I just want to know if you're familiar with it. So you are? I believe so. If it's the case I'm thinking of, that's my answer. Okay. Let me ask you this question. So the focus there seems to be on substance versus procedure and whether a challenge was substantive as opposed to procedural, and that if it was substantive there would be no jurisdiction. You look not as familiar as the cases that you're looking at. That's okay. Sorry. We'll pass. Thank you. Okay, thank you. Okay, thanks very much.